IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JESSE J.,[1] | ) | |
| | ) | Civil Action No. 7:22-cv-00462 |
| Plaintiff, | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| MARTIN O'MALLEY,[2] | ) | By: C. Kailani Memmer |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Jesse J. ("Jesse") filed this action challenging the final decision of the
Commissioner of Social Security ("Commissioner") finding him not disabled and therefore
ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42
U.S.C. §§ 401–433. Jesse alleges that Administrative Law Judge ("ALJ") David Lewandowski
erred in his assessment of Jesse's (1) mental impairments, (2) subjective allegations, and (3)
physical impairments and residual functional capacity ("RFC") findings.

This case is before me on referral under 28 U.S.C. § 636(b)(1)(B), dated October 12,
2023. ECF No. 27. Jesse did not request oral argument be scheduled in this case. *See* ECF No.
20. Having considered the administrative record, the parties' filings, and the applicable law, I
find that that the Commissioner's decision is not supported by substantial evidence. Accordingly,
and for the reasons detailed below, I respectfully recommend that the presiding District Judge
**GRANT** Jesse's Motion for Summary Judgment, ECF No. 19; **DENY** the Commissioner's

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security
opinions.
[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule
25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi
as the defendant in this suit. No further action need be taken to continue this suit by reason of the last
sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Motion for Summary Judgment, ECF No. 25; **REVERSE** the Commissioner's final decision denying Jesse's DIB claim; **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g); and **DISMISS** this case from the Court's active docket.

## STANDARD OF REVIEW

The court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Jesse failed to demonstrate that he was disabled under the Act.[3] *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). While substantial evidence is a somewhat deferential standard, the Court does not "reflexively rubber-stamp an ALJ's findings." *Lewis v. Berryhill*, 858 F.3d 858, 870 (4th Cir. 2017).

"In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro*, 270 F.3d at 176 (quoting *Craig*, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v.*

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period for not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work; instead, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. *See* 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

*Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. *Hays v. Sullivan*, 907 F. 2d 1453, 1456 (4th Cir. 1990).

In contrast, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" where the court is "left to guess [at] how the ALJ arrived at his conclusions"). The ALJ must sufficiently articulate his findings such that the district court can undertake meaningful review. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

## CLAIM HISTORY

Jesse filed for DIB on January 29, 2020, alleging disability beginning September 3, 2019. R. 109, 191. His claim was denied at both the initial level and on reconsideration on June 17, 2020, and August 27, 2020, respectively. R. 15. Jesse appeared before the ALJ by telephone on July 8, 2021. R. 41–68. At that hearing, Jesse amended his alleged date of disability to July 3, 2016. R. 45–46. Asheley Wells testified as an impartial vocational expert. R. 64–67. The ALJ issued an "Unfavorable Decision" analyzing Jesse's claim under the familiar five-step process[4] on September 2, 2021, and denied Jesse's claim for benefits. R. 12–36.

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether she can perform other work. *Johnson v. Barnhart*, 434 F.3d 650, 654 n.1 (4th Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a *prima facie* case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the RFC, considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the national economy. 42 U.S.C. § 423(d)(2)(A); *Taylor v. Weinberger*, 512 F.2d 664, 666 (4th Cir. 1975).

At the first step, the ALJ found that Jesse had not engaged in substantial gainful activity during the period since July 3, 2016, the amended alleged onset date. R. 18. At the second step, the ALJ found that Jesse has the following severe impairments: cervical and lumbar degenerative disc disease; migraines; sleep apnea; hypertension; kidney stones; chondromalacia patella and patellar tendonitis; post-traumatic stress disorder; major depressive disorder; alcohol use disorder; cannabis use disorder; and borderline personality disorder. R. 18.

As to the third step, the ALJ found that Jesse's impairments, either individually or in combination, did not meet or equal a listed impairment. *Id.* The ALJ specifically considered Listing 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root(s)), 1.16 (lumbar spinal stenosis resulting in compromise of the cauda equina), 1.18 (abnormality of a major joint(s) in any extremity), 11.02 (epilepsy), 3.00P, 3.09 (chronic pulmonary hypertension due to any cause), 4.02 (chronic heart failure), 4.00H1, 6.00 (genitourinary disorders), 12.04 (depressive, bipolar and related disorders), 12.08 (personality and impulse-control disorders), and 12.15 (trauma- and stressor-related disorders). R. 19–20. The ALJ found that Jesse has moderate limitations regarding understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. R. 20–22.

The ALJ concluded that Jesse has the RFC to:

Perform sedentary work as defined in 20 CFR 404.1567(a) except he can occasionally perform postural activities but never climb ladders, ropes, or scaffolds; should avoid concentrated exposure to vibrations and industrial hazards; should avoid exposure to loud noise, such as heavy traffic; is able to understand, remember, and apply simple instructions and perform simple 1-2 step tasks; can have occasional interaction with others; should avoid fast pace work, meaning work that requires moving rapidly with high productivity levels, tight deadlines, or quick turnaround, such as an assembly line worker or a server in a crowded restaurant; and is expected to be off-task 10% of the workday.

R. 21.

At the fourth step, the ALJ concluded that Jesse is unable to perform any past relevant work. R. 34.  At the fifth step, the ALJ identified jobs in significant numbers in the national economy that Jesse could perform, including positions as an addressing clerk, document preparer, and weight tester. R. 35. Thus, the ALJ determined that Jesse was not disabled. *Id.* The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Jesse's request for review on June 15, 2022. R. 1–3. This appeal followed.

<u>ANALYSIS</u>

Jesse argues that there is not substantial evidence to support the ALJ's assessment of Jesse's (1) mental impairments; (2) subjective allegations, and (3) physical impairments and RFC findings. ECF No. 20 at 26–44.

**A.  Medical History Overview**

Jesse was born on June 14, 1977. R. 191. He has a high school education. R. 46. He has a past work history that includes working as a metal fabricator and a forklift operator. R. 34, 46–47.

Jesse was diagnosed with hypertension in 2002. R. 803. He was placed on medication for hypertension at that time, including 20 mg lisinopril daily and 5 mg amlodipine daily. *Id.*

Jesse presented to the care of Stella M. Bassey, M.D., at Salem VA Medical Center ("VAMC") on February 3, 2014. R. 862–64. At that time, Dr. Bassey noted that Jesse "continue[d] to struggle with PTSD and irritability/anxiety." R. 862. Dr. Bassey further noted that Jesse did not take Risperdal that he was prescribed because of excessive sedation. *Id.* Mental examination findings were unremarkable. R. 863. Dr. Bassey tapered and discontinued Jesse's Prozac and Risperdal, and she started Jesse on 100 mg Zoloft daily for PTSD and 100 mg Neurontin daily for anxiety. R. 863–64.

5

On March 10, 2014, Jesse returned to the care of Dr. Bassey. R. 859–61. Jesse reported that his condition was the same as it had been, but he complained of nose bleeds, dizziness, and high blood pressure readings. R. 859. Mental examination findings were unremarkable. R. 860. Dr. Bassey increased Jesse's Neurontin to 200 mg daily for anxiety. *Id.*

On May 12, 2014, Jesse returned to the care of Dr. Bassey. R. 856–58. Jesse reported no changes in his mental health. R. 856. Mental examination findings were unremarkable. R. 857. Dr. Bassey increased Jesse's Zoloft to 150 mg daily. *Id.*

In a "Review Post Traumatic Stress Disorder Disability Benefits Questionnaire" dated October 14, 2014, Christopher Muller, Ph.D., a clinical psychologist at VAMC, summarized Jesse's occupational and social impairments as "[o]ccupational and social impairment with reduced reliability and productivity." R. 848. Dr. Muller described one incident in which Jesse took his son to an NFL football game and struggled with the subsequent anxiety caused by the large crowd in attendance. R. 850. Dr. Muller noted that Jesse, who was working as a forklift operator at the time got along "ok" with coworkers. *Id.* At that time, Jesse reported difficulty with memory, constant depressed mood, little interest or enjoyment, crying spells, emotional numbness, hypervigilance, anxiety, low concentration, hyperstartle, irritability, and poor sleep. R. 853–54.

Additionally on October 14, 2014, Jesse indicated to David J. Thaler, DO, of the VAMC, that Jesse "has had on and off back pain for years." R. 805.

On October 21, 2014, Jesse returned to the care of Dr. Bassey. R. 797–800. Jesse reported that he had not been doing well in the past few weeks and described his mood as depressed. R. 797. He further reported that he had poor sleep, poor appetite, low energy, loss of interest, and a sense of helplessness. *Id.* Dr. Bassey noted that Jesse had been off his

psychotropic medication for PTSD "for a while," and that Jesse indicated interest in resuming medications. *Id.* Mental examination findings were mostly unremarkable except for depressed mood and dysphoric affect. R. 799. Dr. Bassey ordered that Jesse resume Zoloft 50 mg daily and begin 0.5 mg Clonazepam bidaily as needed for anxiety. R. 800.

Jesse returned to the care of Dr. Bassey on October 31, 2014. R. 790–93. Jesse reported that he was doing better since he resumed Zoloft. R. 790. Mental examination findings were unremarkable. R. 792.

On March 7, 2015, Jesse presented to the emergency department at Roanoke Memorial Hospital complaining of high blood pressure and facial swelling. R. 354–59. Jesse's swelling was localized to his upper lip and right side of his face, which began on March 6, 2015. R. 354. He reported blurred vision and headaches. *Id.* Physical examination findings were mostly unremarkable aside from facial swelling and a large, scabbed blister inferior to the right nostril. R. 355. His pressure reading was 164/100 at 20:43, but it improved to 120/75 on fourth reading at 23:21. *Id.* Jesse's vital interpretation found him to be hypertensive and borderline tachycardic. *Id.* Doctors treated Jesse with Clindamycin, Decadron, and Percocet. R. 358.

On May 15, 2015, Jesse presented to the care of Anjali Varma, M.D., of VAMC. R. 782–86. He reported that he had been "off all psych meds for over 2 months." R. 782. He further reported poor sleep, anxiety, anger, poor impulse control, and crying spells. *Id.* Mental examination findings were unremarkable. R. 784. Jesse was diagnosed with chronic PTSD, moderate recurrent major depressive disorder, moderate alcohol use disorder, and borderline personality disorder. *Id.* Dr. Varma ordered Jesse to start 25 mg lamotrigine daily. R. 785.

On June 26, 2015, Jesse returned to the care of Dr. Varma. R. 777–80. Jesse reported that the medication "helped a whole lot." R. 777. He reported "spurts of anger," and pain caused by

kidney stones. *Id.* Mental examination findings were unremarkable. R. 779–80. Dr. Varma

increased Jesse's lamotrigine dosage to 150 mg daily and added 6 mg doxepin for sleep. R. 780.

Jesse returned to the care of Dr. Varma on January 21, 2016. R. 771–75. He reported

irritability, anger, outbursts of physical violence not directed at others, and difficulty sleeping. R.

771. Jesse stated that he "wish[ed] he did not have to deal with people." *Id.* Mental examination

findings were unremarkable. R. 773-74. Dr. Varma increased Jesse's lamotrigine to 200 mg daily

and started Jesse on 2 mg prazosin at nighttime for nightmares. R. 774.

On February 23, 2016, Jesse presented to the emergency department at Roanoke

Memorial Hospital with complaints of chest pain associated with cough, dizziness, and shortness

of breath. R. 348–51. He reported feeling anxious prior to the onset of the chest pain. R. 348.

Physical examination findings were mostly unremarkable; however, Jesse appeared lethargic,

discomforted, and anxious. R. 349. The final impression was anxiety-induced chest pains. R.

351.

On April 7, 2016, Jesse returned to the care of Dr. Varma. R. 766–70. He reported that he

continued to struggle with the symptoms of PTSD, including avoidance of crowds, paranoia,

trouble expressing tender emotions, and lack of sleep. R. 766. Additionally, he reported

continuing irritability, anger, and outbursts of physical violence not directed at others. *Id.* He

indicated that he struggled with work because frequent flashbacks caused difficulties with

concentration and focus. *Id.* Mental examination findings were unremarkable. R. 768–69.

On July 11, 2016, Jesse returned to the care of Dr. Varma. R. 761–65. He reported that he

was doing "pretty good," but that he had been having more frequent crying spells. R. 761.

Mental examination findings were unremarkable. R. 763–64. Dr. Varma started Jesse on 10 mg

Lexapro daily to address crying spells and 10 mg hydroxyzine twice daily for anxiety. R. 764.

On August 16, 2016, Jesse underwent a CT scan of his abdomen and pelvis. R. 2165–67.
The scan revealed bilateral intrarenal nephrolithiasis. *Id.*

On October 13, 2016, Jesse returned to the care of Dr. Varma. R. 756–60. He reported
"ups and downs," and indicated worsening depression, crying spells, lack of motivation, and
outbursts of anger. R. 756. Dr. Varma noted a slow gait with support as a result of a recent
lumbar puncture. R. 759. Mental examination findings were unremarkable. *Id.* Dr. Varma
increased Jesse's Lexapro to 20 mg daily to target the crying spells, increased his hydroxyzine to
20 mg twice daily as needed for anxiety, and discontinued the prazosin. R. 760.

On October 28, 2016, Jesse underwent an MRI of his cervical spine because of neck pain,
back pain, and arm/leg weakness. R. 2140–43. The MRI revealed small right paracentral
extrusion mildly indenting the right cord at C4-5, which is described by the diagnostic codes as a
"significant abnormality, [attention] needed." R. 2143.

On November 9, 2016, Jesse underwent a CT myelogram of the cervicothoracolumbar
spine because of a low-pressure headache. R. 2138–40. The imaging showed no area of a
cerebrospinal fluid leak; however, it did reveal a questionable deficiency along the right
cribriform plate. R. 2139.

On January 12, 2017, Jesse returned to the care of Dr. Varma. R. 745–48. Jesse was using
a cane at this visit. R. 745. He reported a recent decline in physical health, a recent diagnosis of a
defect in his right cribriform plate, worsening depression, crying spells, severe persistent and
disabling symptoms of PTSD, lack of motivation, and outbursts of anger. *Id.* Mental examination
findings were unremarkable. R. 747. Dr. Varma did not change Jesse's medication. R. 748.

On January 26, 2017, Jesse presented to the emergency department at Roanoke Memorial
Hospital following a motor vehicle collision. R. 345–48. He reported a severe headache that

9

worsened with movement, neck and back pain, and a shooting pain stemming from the lower

back down the left leg. R. 345. Physical examination was mostly unremarkable, but Jesse did

demonstrate some tenderness diffusely throughout the spine. R. 346. A CT scan of the thoracic

spine was notable for incidental findings of small sliding-type hiatal hernia, bilateral

nonobstructive nephrolithiasis, mild-to-moderate pancreatic atrophy, subsegmental atelectasis

within the right middle lobe, and "probable" cholelithiasis. R. 346, 366–67. Additionally, a CT

scan of the lumbar spine was significant for degenerative changes with "probable" left

foraminal/subarticular extrusion of L5-S1. R. 346–47.

On February 1, 2017, Jesse presented to the care of Spencer Payne, M.D., on referral

from Dr. Brian Goss for an otolaryngology consultation. R. 418–20. Jesse reported that his

primary symptoms are dizziness, weakness, loss of balance, the inability to drive, and the use of

a cane to walk. R. 418. Physical examination was unremarkable, aside from high blood pressure.

R. 419. Dr. Payne conducted a diagnostic nasal endoscopy, which revealed no notable findings.

R. 420. Dr. Payne assessed Jesse with cerebrospinal fluid rhinorrhea, but Dr. Payne noted that

there was no radiographic evidence of the leak. *Id.* Dr. Payne recommended that Jesse not

engage in heavy lifting or bending over, and that he should use a stool softener to avoid straining

with bowel movements. *Id.*

On March 15, 2017, Jesse returned to the care of Dr. Payne. R. 421–24. Jesse complained

of headache, neck pain, and lower back pain. R. 421. He described a right-side, throbbing

headache with right eye twitching, and he rated his pain at 6 or 7 out of 10. *Id.* He reported that

at times his nose would have clear rhinorrhea from the right side, mainly in the morning. *Id.* Dr.

Payne performed another diagnostic nasal endoscopy, which revealed no abnormal findings. R.

10

422. CT imaging of Jesse's sinuses did not show any areas concerning for cerebrospinal fluid

leak. R. 423. Dr. Payne referred Jesse to a neurologist for further evaluation and treatment. *Id.*

Jesse began physical therapy on March 31, 2017, to treat his lower back pain. R. 741–44.

Jesse was scheduled to undergo physical therapy two days per week for twelve weeks. R. 744.

The record indicates he began this regimen on May 17, 2021. R. 734–35. He underwent a second

physical therapy consultation for back and neck pain on November 22, 2017, after which he was

scheduled to undergo physical therapy two days per week for four to six weeks. R. 708–09. He

was discharged from physical therapy on December 21, 2017, and was advised to continue with

a home exercise program. R. 701.

On April 13, 2017, Jesse returned to the care of Dr. Varma. R. 736–40. Jesse was using a

cane at that time. R. 736. Jesse reported a continual health decline and problems with gait and

balance. *Id.* He reported worsening depression, lack of motivation, fatigue, outbursts of anger,

and difficulty sleeping. *Id.* Dr. Varma noted that Jesse was going to begin physical therapy for

his back pain. R. 737. Dr. Varma further noted that Jesse's gait was slow, and that Jesse required

a cane. R. 738. Mental examination findings were unremarkable. R. 738–39.

On May 8, 2017, Jesse presented to the care of Kathryn Cathcart, PA-C, at the Adult

Neurology Clinic at UVA, for a neurological evaluation. R. 424–28. Jesse endorsed daily

headaches beginning in July 2016. R. 424. That day, Jesse complained of a constant, right-sided

headache and right eye blurry vision associated with photophobia, phonophobia, nausea, and

disequilibrium. R. 425. Physical examination findings revealed high blood pressure, tenderness

of the scalp muscles to palpation, as well as tenderness of the posterior cervical muscles to

palpation. R. 426–27. Neurological examination findings were unremarkable aside from

photosensitivity. R. 427. Ms. Cathcart assessed Jesse with chronic migraines. *Id.*

11

On June 23, 2017, Jesse underwent X-ray imaging. R. 2126–27. The x-rays revealed minimal degenerative changes at C4-5 and C5-6, as well as grade 1 spondylolisthesis at L5-S1. *Id.*

On July 14, 2017, Jesse returned to the care of Dr. Varma. R. 720–24. Jesse was using a cane to walk at that time. R. 720. He reported ongoing frustration with his medical treatment regarding the suspect cerebrospinal fluid leak. *Id.* He further reported mild worsening of his symptoms of PTSD, as well as worsening depression, lack of motivation, anger outbursts, and difficulty sleeping. *Id.* Jesse had not been taking his lamotrigine or his Lexapro, as he indicated that he was tired of taking medications. *Id.* Dr. Varma agreed to discontinue both Lexapro and lamotrigine. R. 723.

On October 23, 2017, Jesse underwent x-ray imaging which revealed mild spondylosiss at C1-2, as well as mild spondylosis and stable anterior listhesis of L5 on S1. R. 2122.

On December 29, 2017, Jesse presented to the care of Esther Brahmstadt, Ph.D., at the VAMC for a psychological evaluation. R. 697-700. Mental examination findings were unremarkable. R. 697-98. Dr. Brahmstadt diagnosed Jesse with chronic PTSD and borderline personality disorder. R. 699.

On February 21, 2018, Jesse underwent x-ray imaging of the cervical spine, which revealed minimal degenerative changes at C4-5 and C5-6. R. 2116. On April 22, 2018, he underwent CT imaging of the cervical spine, which revealed mild-to-moderate spinal canal stenosis at C4-5. R. 2110–11.

On July 23, 2018, Jesse underwent MRI of the abdomen, which revealed multiple renal cystic abnormalities. *See* 2100–03.

On October 1, 2018, Jesse underwent a fluoroscopically guided lumbar puncture. R. 597.

On October 15, 2018, Jesse began physical therapy at VAMC. R. 677. He was discharged from physical therapy on January 3, 2019, and the discharge note indicated that Jesse continued to have antalgic gait and decreased strength in the right leg. R. 654.

On February 21, 2019, Jesse underwent an MRI of the right knee, which revealed grade 1 intrasubstance signal in the posterior horn of the medical meniscus and a small popliteal cyst. R. 587–90.

On September 30, 2019, Jesse underwent a translaminar epidural steroid injection at L5-S1. R. 548–50.

On October 4, 2019, Jesse presented to the care of John Feldenzer, M.D., of VAMC, for a neurology consultation. R. 536. Physical examination revealed tenderness to palpation over the lumbosacral junction and less so sacroiliac areas. *Id.* Jesse demonstrated slight tenderness in the right sciatic notch but not on the left, and the straight leg raising test produced back pain only on each side. *Id.* Jesse's gait was slightly antalgic. *Id.* MRI imaging revealed that Jesse had absent lumbar lordosis but normal alignment except for a mild grade 1 spondylolisthesis of L5 on S1; mild desiccation of the L4-5 and L5-S1 disks; mild to moderate bilateral L5 foraminal narrowing, left greater than right; and a tiny insignificant left paracentral protrusion at L4-5. *Id.*

On November 21, 2019, Jesse returned to the care of Dr. Varma. R. 638–42. Jesse reported that he had continued to experience sleep difficulties and that he had been "more nervous, anxious and fidgety" since he began using trazadone. R. 638. Additionally, he reported more vivid nightmares and that he had been acting out violently in his sleep. *Id.* Consequently, Jesse expressed his desire to discontinue the use of trazadone. *Id.* Mental examination findings showed that his mood and affect were crying and tearful, and he demonstrated a "normal/short attention span." R. 641–42.

13

On November 29, 2019, Jesse presented to VAMC for a physical therapy consultation related to a left ankle sprain. R. 534–35. Ultimately, Jesse was scheduled to be seen up to twice weekly for four weeks. R. 535.

On January 29, 2020, Jesse underwent a fluroscopically guided caudal epidural steroid injection at the L5 level. R. 546–48. On February 8, 2020, he presented to the emergency department at VAMC with complaints of back pain, neck pain, and neck pressure. R. 527–29. He reported that his back pain began shortly after undergoing steroid injections. R. 529. He rated his pain as 9 out of 10. *Id.* He received a 60 mg injection of ketorolac in his right glute, which he tolerated well and afterwards reported that his pain was improving. *Id.* Jesse underwent additional steroid injections at L5-S1 on May 13, 2020, and May 27, 2020. R. 882, 884.

On July 15, 2020, and July 24, 2020, Jesse underwent BioWave therapy for lumbar spondylosis. R. 911, 1181.

On August 30, 2020, Jesse presented to the emergency department at VAMC with complaints of worsening lower back pain. R. 1170–72. He reported that the previous day, he was bending over to lift something and heard a pop in his back. R. 1170. Jesse was able to ambulate and walk into the emergency room on his own. *Id.* X-ray imaging revealed "some concern of [degenerative joint disease]." R. 1171. Jesse received a 60 mg injection of Toradol. *Id.*

On September 15, 2020, Jesse presented to the care of David Clark, PA, at the Lewis-Gale Medical Center in Roanoke, Virginia. R. 942–44. Jesse reported that his epidural steroid injections at the L5-S1 epidural space did not provide any lasting benefit or relief. R. 942. Additionally, Jesse indicated that he continued to experience burning and stabbing pain down his bilateral posterolateral thighs into his lower legs. *Id.* Physical examination findings were notable for diminished flexion in the hips bilaterally, diminished flexion and extension in the knees,

14

diminished left dorsiflexion and plantar flexion, and decreased sensation to light touch over the right lateral malleolus. R. 943. Jesse was assessed with lumbar region spondylolisthesis and lumbar radicular pain. *Id.* Jesse received a Toradol injection. *Id.* Additionally, Mr. Clark began Jesse on 4 mg tizanidine daily and referred him for an MRI of the lumbar spine. *Id.*

On January 7, 2021, Jesse presented to the emergency department at VAMC with complaints of a lump in his right armpit and worsening lower back pain radiating to the left leg. R. 1097–1100. He reported that his pain worsened with movement, and that he had intermittent numbness and weakness in his left lower extremity. R. 1098. Physical examination revealed that Jesse was ambulating well; had full range of motion of the lumbosacral spine with increased lower lumbar pain with flexion and extension; and had a small mass in his right armpit consistent with an epidermal cyst. R. 1099. Jesse received a 60 mg Toradol injection and was discharged. R. 1099–1100.

On February 7, 2021, Jesse presented to the care of the emergency department at VAMC after a fall. R. 1072–74. Jesse indicated that he had gotten dizzy and fell backwards, hitting his head. R. 1072. His gait was unsteady, and he complained of dizziness and falls since February 5, 2021. R. 1074.

On February 23, 2021, Jesse returned to the care of Dr. Varma via telephone. R. 1054–55. Jesse reported extreme pain, worsening PTSD symptoms, increased emotionality, and crying spells. R. 1054. Jesse's wife, Rochelle, endorsed Jesse's increased emotionality, sadness, irritability, and forgetfulness. *Id.* Jesse reported that he was going to call Dr. Varma the week prior, but that he forgot her name. *Id.* Dr. Varma increased Jesse's dosage of Remeron and advised him to use Valium on an as-needed basis. R. 1055.

15

On April 9, 2021, Jesse presented to the emergency department at VAMC with complaints of groin and flank pain, decreased urine production, nausea, and possible kidney stone. R. 1000–03. He rated his pain as being a 10 out of 10 and described it as a sharp, shooting pain. R. 1002. CT imaging of the abdomen and pelvis revealed a 4 mm right proximal ureteral stone with mild hydroureter and hydronephrosis, along with multiple additional bilateral renal calculi. R. 1263–64. He was discharged that day with a prescription for hydrocodone. R. 993.

Jesse returned to the emergency department at VAMC on April 14, 2021, and May 13, 2021, with similar complaints of flank pain and nausea. R. 1257–58, 1475. CT imaging performed during both visits revealed ureteral calculi. R. 1261–62, 2058–60.

On May 27, 2021, Jesse presented to the care of Ansley Taylor Corson, a resident in psychology, at VAMC. R. 2236–37. He endorsed feelings of depression and hopelessness, as well as passive suicide ideation. R. 2237. Provisional diagnoses included chronic post-traumatic stress disorder, borderline personality disorder, cannabis abuse, unspecific depressive disorder, obstructive sleep apnea, and dependence on other enabling machines and devices (CPAP machine). *Id.*

On June 8, 2021, Jesse underwent surgery for implantation of a midline epidural spinal cord stimulator lead. R. 2227–29. Brian Dezzutti, M.D., of VAMC, performed the procedure. R. 2227. Dr. Dezzutti implanted the lead adjacent to the top of the T7 vertebrae, then he activated the stimulator. R. 2228. Dr. Dezzutti noted that Jesse "received good low back and left lower extremity coverage in the normal painful areas." *Id.*

On June 14, 2021, Jesse returned to the care of Dr. Dezzutti for a follow-up on the spinal cord stimulator trial. R. 2226. Jesse reported "50–60% pain relief overall and [that] the symptoms of pain radiating into [his] lower extremities resolved completely." *Id.* Dr. Dezzutti

16

removed the spinal cord stimulator leads from Jesse. R. 2225. Jesse indicated a desire to proceed

with the full implantation of a spinal cord stimulator and reported that he noticed "a huge

difference" when the lead was turned off. *Id.*

On June 22, 2021, Jesse presented to the emergency department at VAMC with

complaints of lower back pain that radiated to the left foot. R. 2278–81. He was ambulatory on

arrival. R. 2280. Physical examination revealed mild tenderness to palpation of the left low back

with mild lumbar paraspinous. *Id.* Jesse received a 60 mg Toradol injection. *Id.*

### B.  Medical Opinion Summary

On June 17, 2020, David Bristow, M.D., a medical consultant with Disability

Determination Service, opined that Jesse can occasionally lift or carry 20 pounds; frequently lift

or carry 10 pounds; stand or walk for about 6 hours in an 8-hour workday; sit for about 6 hours

in an 8-hour workday; push or pull, including operation of hand or foot controls, without limit;

occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; balance without

limitation; occasionally stoop, kneel, crouch, or crawl; and should avoid concentrated exposure

to noise and vibration. R. 82–84.

On June 17, 2020, Richard Luck, Ph.D., a medical consultant with Disability

Determination Service, opined that Jesse has the following medically determinable impairments:

degenerative disc disease; sleep-related breathing disorders; hyperlipidemia; essential

hypertension; diseases of esophagus; hernias; chronic kidney disease; migraine; substance

addiction disorders (drugs); substance addiction disorders (alcohol); depressive, bipolar and

related disorders; personality disorders; trauma- and stressor-related disorders; anxiety and

obsessive-compulsive disorders. R. 79.  Furthermore, Dr. Luck opined that Jesse has moderate

17

limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. R. 80.

On August 27, 2020, Jack Hutcheson, M.D., a medical consultant with Disability Determination Service, opined that Jesse can occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; push or pull, including operation of hand or foot controls, without limit; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; balance without limitation; occasionally stoop, kneel, crouch, or crawl; and should avoid concentrated exposure to noise, vibration, and hazards. R. 102–03.

On August 27, 2020, Jo McClain, Psy.D., a psychological consultant with Disability Determination Service, opined that Jesse has the following medically determinable impairments: degenerative disc disease; hyperlipidemia; essential hypertension; diseases of esophagus; hernias; chronic kidney disease; migraine; substance addiction disorders (drugs); substance addiction disorders (alcohol); depressive, bipolar and related disorders; personality disorders; trauma- and stressor-related disorders; anxiety and obsessive-compulsive disorders. R. 99. Dr. McClain further opined that Jesse has moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.*

### C. Administrative Hearing Testimony

At the administrative hearing on July 8, 2021, Jesse testified that he experiences migraines "a couple times a month," and that those migraines were often associated with nausea, vomiting, confusion, and sweaty palms. R. 49. He testified regarding his lower back problems, kidney stones, and pain in his legs and feet. *Id.* He testified that his low back pain was constant,

and he described it as a sharp, stabbing pain that radiates down his legs. R. 49–50. He testified

that he has had kidney stones for twenty years, and that he typically passes two or three kidney

stones each month. R. 50. He testified that when he passes a kidney stone, he usually gets in the

bathtub and cries. *Id.*

Jesse further testified that his neck pain is constant and accompanies his low back pain.

R. 50–51. He described his neck pain as a dull, "kind of pressure pain." R. 51. He next described

the pain in his feet as occurring when his back pain radiated down his legs. *Id.* He testified that

when he experienced pain in his feet, he was not able to stand in the same position for long

periods of time. *Id.*

Jesse testified that after standing for periods of time up to thirty or forty-five minutes, his

legs become weak, and he subsequently falls. R. 52. His testimony indicated that such falls were

frequent. *See* R. 52. He testified that in 2016, the VA prescribed him a cane to use for both

walking and balancing. R. 52–53. Additionally, he testified that he uses heating pads and ice

packs to ease his pain, along with non-narcotic pain medication. R. 53.

Additionally, Jesse testified that he gets treatment at the VA for mental health issues,

including PTSD and panic attacks. R. 54. He testified that he experiences panic attacks two or

three times per month, and that there is nothing in particular that triggers them. *Id.* When he

experiences a panic attack, his hands become sweaty and he begins to shake. *Id.* As to Jesse's

depression, he testified that he cries, becomes angry, has difficulty concentrating, and forgets

things. R. 55. He also testified that he has difficulty sleeping. *Id.* As to his PTSD, he testified that

he has a startle response and occasional nightmares. R. 57.

As to his daily activities, Jesse testified that he is able to do some chores around the

house, but it takes him a while to complete those chores. R. 55–56. He testified that when doing

things such as loading the dishwasher and folding laundry, he often has to stop and take breaks because of his pain. R. 56.

### D. The Commissioner's Decision is Not Supported by Substantial Evidence

Jesse argues that there is not substantial evidence to support the ALJ's assessment of (1) Jesse's mental impairments, (2) subjective allegations, and (3) physical impairments and RFC findings. ECF No. 17 at 17, 23.

#### 1. The ALJ's Assessment of Jesse's Mental Impairments

Jesse argues that the ALJ failed to properly assess his mental impairments as required by SSR 96-8p. *See Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p (S.S.A. July 2, 1996).

SSR 96-8p requires an ALJ to include a narrative discussion describing how the evidence supports his conclusion when developing the RFC. *See Teague v. Astrue*, No. 1:10-cv-2767, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011). The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p at *7; *Meadows v. Astrue*, No. 5:11-cv-63, 2012 U.S. Dist. LEXIS 115150, at *24 (W.D. Va. Aug. 15, 2012); *see also Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often).

In *Shinaberry v. Saul*, the Fourth Circuit confirmed that an "ALJ cannot summarily 'account for a claimant's limitations in concentration, persistence, and pace by restricting the

hypothetical question to simple, routine tasks or unskilled work,' because 'the ability to perform simple tasks differs from the ability to stay on task." *Shinaberry v. Saul*, 952 F.3d 113, 121 (4th Cir. 2020) (quoting *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015)). Nevertheless, *Mascio* does "not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." *Id.* In contrast, *Shinaberry* highlights "sister circuits" which conclude that "limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations [in concentration, persistence, or pace]" when the "medical evidence demonstrates that a claimant can engage in simple, routine tasks, or unskilled work, despite [these] limitations." *Id.* (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). *Shinaberry* further confirms that *Mascio* simply emphasizes the ALJ's duty to adequately review the evidence and explain his decision.

In part, I find that Jesse's objections to the ALJ's assessment of his mental impairments merely cites to evidence that would suggest a finding of more severe mental impairments. *See* ECF No. 20 at 29. This Court will not re-weigh conflicting evidence insofar as the ALJ makes his findings after considering the evidence in the record, which is an issue discussed in greater detail below. Aside from that, however, I find that the ALJ did not commit the sort of error contemplated by *Mascio* and *Shinaberry*.

Nevertheless, an ALJ may not cherry-pick, misstate, or mischaracterize material facts related to his ultimate conclusion. *Arakas v. Comm'r*, 983 F.3d 83, 99 (4th Cir. 2020). Courts in this Circuit must vacate the Commissioner's decision where an ALJ improperly cherry-picks facts that support a finding of "not disabled." *Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017).

21

Additionally, the Fourth Circuit has explained a proper RFC analysis has three

components: (1) evidence, (2) logical explanation, and (3) a conclusion. *See Thomas v. Berryhill*,

2019 U.S. App. LEXIS 1312, at *6 (4th Cir. 2015). Meaningful review is frustrated when an ALJ

goes straight from listing evidence to stating a conclusion. *See Woods v. Berryhill*, 888 F.3d 686,

694 (4th Cir. 2018).

Here, the ALJ mischaracterized the medical evidence relating to Jesse's mental

functioning and did not provide a logical explanation for Jesse's RFC findings related to his

mental impairments. The ALJ states that "treatment notes from 2016 and 2017 show mostly

normal mental status examination findings" and cites to R. 30, 757, and 769. R. 30. However,

that statement mischaracterizes the evidence in the record to wrongly imply that Jesse's mental

state during that time was normal. On July 11, 2016, Jesse reported an incident where his anxiety

caused him to leave a restaurant, and he reported continuing to struggle with ongoing symptoms

of PTSD, including avoidance of crowds, paranoia, trouble expressing tender emotions, and lack

of sleep. R. 761. On October 13, 2016, Jesse endorsed worsening depression, crying spells, and

lack of motivation. R. 756. Likewise, on January 12, 2017, April 13, 2017, and July 14, 2017,

Jesse continually endorsed worsening of his mental health symptoms. R. 736, 745. The ALJ

"cherry-picked" the 2016 and 2017 mental examination findings, which are virtually identical

and unremarkable throughout the record, to support his ultimate conclusion while ignoring the

contrary findings in the record about Jesse's mental health.

Secondly, when discussing the RFC, the ALJ goes straight from listing the evidence

related to Jesse's mental impairments to making a conclusion about the appropriate limitations

without any logical explanation. *See* R. 30–31. Meaningful review is frustrated when an ALJ

goes straight from listing evidence to stating a conclusion. *See Woods v. Berryhill*, 888 F.3d 686,

694 (4th Cir. 2018). While the Court could infer a logical explanation based on the ALJ's recitation of the evidence, such an inference leaves the Court in the position of having to "guess" at how the ALJ arrived at his conclusion. Thus, remand is warranted. *See Mascio* 780 F.3d at 636.

While this Court does not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro*, 270 F.3d at 176, it must vacate the Commissioner's decision where an ALJ improperly "cherry-picks" facts that support a finding of "not disabled." *Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017). I find that the ALJ mischaracterized or ignored medical evidence pertaining to Jesse's mental health during the relevant period. Furthermore, the ALJ failed to provide a logical explanation in his RFC analysis related to Jesse's mental health impairments and instead merely recited evidence and gave his conclusion. Therefore, I find that substantial evidence does not support the ALJ's assessment of Jesse's mental impairments.

## 2. The ALJ's Assessment of Jesse's Subjective Allegations

Jesse also argues that the ALJ's assessment of his subjective allegations is not supported by substantial evidence. Specifically, he argues that the ALJ ignored or minimized evidence in the record, as well as failed to qualify the extent to which Jesse performed daily activities. ECF No. 20 at 34–42.

The ALJ follows a two-step analysis when considering a claimant's subjective statements about his impairments and symptoms. *See* SSR 16-3P, 2016 WL 1119029 (S.S.A. Oct. 25, 2017); 20 C.F.R. § 404.1529(b)–(c). First, the ALJ determines whether there is objective medical evidence showing a medically determinable impairment that could reasonably be expected to produce the claimant's alleged symptoms. *Id.* Second, the ALJ must evaluate the intensity,

persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. 20 C.F.R. § 404.1529(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individuals' case record." *Id.* An ALJ's assessment of the credibility of a claimant's subjective complaints is afforded a high level of deference on review, as the Fourth Circuit has proclaimed such assessments are "virtually unreviewable" on appeal. *Darvishian v. Geren*, 404 F. App'x 822, 831 (4th Cir. 2010).

Here, the ALJ determined that Jesse's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely with the medical evidence and other evidence in the record. *See* R. 25–34.

Jesse argues that the ALJ's assessment of his activities of daily living is deficient because he did not acknowledge "the extent to which [he] performed the daily activities" and "ignored other significant testimony." ECF No. 20 at 35–42. In support of this argument, Jesse cites to *Brown v. Comm'r Soc. Sec.*, 873 F.3d 251, 269–70 (4th Cir. 2017); *Arakas v. Comm'r Soc. Sec.*, 983 F.3d 83, 100 (4th Cir. 2020) and other similar cases in the Fourth Circuit. In *Arakas*, the Court found that the ALJ's assessment regarding the claimant's daily activities failed to account for "significant other testimony" from the claimant that was at odds with the ALJ's conclusion. *Arakas*, 983 F.3d at 100. In doing so, the Court determined that the claimant's subjective allegations and activities of daily living were consistent. *Id*. This error is not present in this case. The ALJ walked through Jesse's daily activities, as well as his allegations of his symptoms, and

concluded that his reported daily activities suggest a lesser degree of functional loss than generally alleged. R. 24.

In *Brown*, the Fourth Circuit found that the ALJ committed numerous errors, including failing to acknowledge the extent of the activities of daily living, stating:

> With respect to the first reason for the adverse credibility finding, the ALJ noted that Brown testified to daily activities of living that included "cooking, driving, doing laundry, collecting coins, attending church and shopping . . . The ALJ did not acknowledge the extent of those activities as described by Brown, e.g., that he simply prepared his meals in his microwave, could drive only short distances without significant discomfort, only occasionally did laundry and looked at coins, and, by the time of the second ALJ hearing, had discontinued regular attendance at church and limited his shopping to just thirty minutes once a week. Moreover, the ALJ provided no explanation as to how those particular activities—or any of the activities by Brown—showed that he could persist through an eight-hour workday.

873 F.3d at 263. Here, unlike in *Brown*, the ALJ's assessment shows he understood Jesse's limits in completing his activities of daily living. *See* R. 24. The ALJ specifically acknowledges that Jesse participates in his activities and is limited in several regards. *Id.* Thus, the ALJ did not err in his assessment of Jesse's subjective allegations.

Therefore, I find that the ALJ's assessment of Jesse's subjective allegations is supported by substantial evidence.

### 3.  The ALJ's Assessment of Jesse's Physical Impairments and RFC Findings

Lastly, Jesse argues that the ALJ erred in his assessment of Jesse's physical impairments by failing to determine Jesse's RFC using a function-by-function analysis. *See* ECF No. 20 at 43.

The ALJ is required to develop an adequate RFC that accounts for the work activities the claimant can perform given the physical or mental impairments affecting his ability to work. Importantly, the ALJ must explain the conclusions reached and explain any record evidence which contradicts the RFC determination. *See* SSR 96-8p, 1996 WL 374184 (S.S.A. July 2,

1996). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting

his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary

work setting on a regular and continuing basis, describe the maximum amount of each work-

related activity the individual can perform, and explain how any material inconsistencies or

ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7.

However, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence

in his decision." *Reid v. Comm'r*, 769 F.3d 861, 865 (4th Cir. 2015) (quoting *Dyer v. Barnhart*,

395 F.3d 1206, 1211 (11th Cir. 2005).

In *Mascio v. Colvin*, the Fourth Circuit rejected a "per se rule requiring remand when the

ALJ does not perform an explicit function-by-function analysis," agreeing instead with the

Second Circuit that " '[r]emand may be appropriate ... where an ALJ fails to assess a claimant's

capacity to perform relevant functions, despite contradictory evidence in the record, or where

other inadequacies in the ALJ's analysis frustrate meaningful review.'" *Mascio*, 780 F.3d at 636

(citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

Here, the ALJ discussed Jesse's physical impairments and resulting limitations. R. 25–30.

The ALJ discussed Jesse's neck and back pain and the related medical evidence to support his

conclusion that Jesse is restricted to "a range of sedentary work with reduced postural and

environmental demands." R. 25–26. He discussed Jesse's spinal disorders and concluded that the

medical evidence did not support greater limitations. R. 27–28. He next discussed Jesse's kidney

stones and the related medical evidence to explain Jesse's RFC and that further limitations were

not warranted. R. 28–29. He then discussed Jesse's headaches and the relevant medical evidence

to explain Jesse's environmental limitations. R. 29–30. He last discussed Jesse's knee problems

and the related medical evidence to support his conclusion about Jesse's RFC. R. 30.

Overall, I find that the ALJ engaged in a sufficient narrative description as required by SSR 96-8p, and that his assessment of Jesse's physical impairments and RFC findings is thorough enough to allow this Court to undertake meaningful review of that assessment. To the extent that Jesse's arguments amount to a request that this Court reweigh the evidence and reach a different conclusion, such a request is impermissible, and I decline to do so. Therefore, the ALJ did not err in his assessment of Jesse's physical impairments and RFC findings.

## CONCLUSION

For the foregoing reasons, I find there is not substantial evidence to support the Commissioner's decision. Therefore, I respectfully recommend that the presiding District Judge **GRANT** Jesse's Motion for Summary Judgment, ECF No. 19; **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 25; **REVERSE** the Commissioner's final decision denying Jesse's DIB claim; **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g); and **DISMISS** this case from the Court's active docket.

## NOTICE TO PARTIES

The clerk is directed to transmit the record in this case to Robert S. Ballou, United States District Judge, and to provide certified copies of this Report and Recommendation to counsel of record.

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party must serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection, including the waiver of the right to appeal.

Entered:  March 1, 2024

*C. Kailani Memmer*

C. Kailani Memmer
United States Magistrate Judge